SCOTT *et al. v.* THE DREW and THE CAMELIA.

*(District Court, S. D. New York.    April 18, 1889.)*

COLLISION—NARROW CHANNEL—CROWDING.

> The steam-tug C., in coming down the narrow channel-way above Four-Mile Point, North river, with a tow upon a hawser, exchanged a signal of one whistle with the passenger steamer D., coming up the river from below.    The D. kept to the extreme right of the channel-way, so that she touched the mud, and was still, or nearly so, when she collided with the libelants' boat on the port side of the last tier of the tow: *Held*, that the D. was without fault, the passage not being so difficult or dangerous as to forbid her entering it, had the tow kept in the middle or on the right-hand side of the channel, as the signals required; (2) that the C. was in fault for sheering to port, after her signal, and that this was not excused by the presence of another steam canal-boat ahead, which the C. desired to pass to the left, as she should have slackened her speed, and not have attempted to pass the other in that situation.

In Admiralty.    Libel for collision.
*Hyland & Zabriskie*, for libelants.
*W. P. Prentice*, for the Drew.
*Owen, Gray & Sturges*, for the Camelia.

BROWN, J.    Shortly after day-break on the morning of June 12, 1888, as the libelants' canal-boat James Ash, one of a fleet of eight boats in tow of the steam-tug Camelia upon a hawser, was going down the North river, she came into collision with the side-wheel passenger steamer Drew, on her trip from New York to Albany, in the narrow channel above Four-Mile Point, on the east side of the channel-way, about 600 or 800 feet above the buoy at the southerly end of the middle ground.    The Ash was the outside boat on the port side of the third or last tier of the tow. The steamer's guard ran over the Ash's port quarter, struck her cabin, and inflicted some damage, for which this libel was filed.    The tide was flood, and the morning clear.    The Camelia was proceeding with her tow at the rate of about two or three knots per hour.    A signal of one whistle was exchanged between her and the Drew when the latter was off Four-Mile Point, from one-third to one-half mile distant from the Camelia, which was then about in the middle of the narrow channel-way.    Some minutes before that, the Camelia had given a signal of one whistle to a steam canal-boat, having in tow another boat along-side, which was going down a short distance ahead of the Camelia, and at a little slower speed, indicating that the Camelia desired to pass her to the westward.    Getting no reply, she then gave the canal-boat two whistles, and hauled somewhat

to the eastward to pass her upon that side, while the steam canal-boat, according to the Camelia's testimony, hauled somewhat to the westward. But both these changes must have been small if at the collision the Camelia was, as her witnesses say, only some 50 feet to the eastward of the steam canal-boat. The witnesses for the Camelia also testify that at the time of the exchange of one whistle with the Drew the steam-tug Norwich, coming up river with a fleet of boats in tow, was nearly abreast of the Drew, and to the westward of her; and that, after an exchange of a signal of one whistle with the Drew, the Camelia at once gave the Norwich a signal of one whistle, to which the Norwich answered with two whistles; and that the Camelia replied with two, indicating that the latter would go to the eastward of the Norwich. The evidence leaves no doubt that the Drew was going very slowly from the time she was abreast of the buoy until she came in contact with the Ash, some 600 or 800 feet above. Her witnesses say that at the moment of collision she was actually still, and touching the mud on the easterly side of the channel-way; and the man on board the Ash, who was abed below, but was roused by the shock, and instantly ran on deck, says his boat was then passing the Drew, as he thinks, at about the rate of a mile an hour. This strongly confirms the testimony of the Drew's witnesses that at the moment of collision the Drew was stopped still, and that the tow was moving forward by the tug's own speed, as the tug did not stop nor slacken. The evidence shows that the Drew passed the Camelia from 75 to 100 feet distant, and the first tier of the tow, which was about 300 feet astern, some 25 or 50 feet distant.

Upon these facts no blame can be attached to the Drew, unless she was bound to stop below the buoy until all the other vessels had got out of the way. In the case of *The Belle and Norwich*, 34 Fed. Rep. 669, it was held, in reference to a collision very near the same spot, that a tug with a large fleet in tow, coming up, ought to wait below the buoy upon the ebb-tide, rather than attempt to pass another tug with a long tow coming down with the ebb at the entrance of a narrow and winding channel, where the ebb-tide also sets towards the westerly shore, on account of the difficulty or impossibility of keeping the tow in line. This is not applicable to a single steamer going up with the flood. The collision in this case was at the narrowest part of the channel-way, and the lowest estimate of its width there was 500 feet. I am not satisfied that there was any real difficulty or danger in even a large steamer like the Drew passing a tow in the narrow channel if both kept, or attempted to keep, their own side of the channel-way, as they should no doubt do. In the present case, if the Norwich and her tow were where the witnesses of the Camelia say they were, it would only have complicated greatly, as it seems to me, the difficulties of the situation, if the Drew had undertaken to wait below the buoy. A much more injurious collision would probably have happened between the tows of the Norwich and the Camelia, unless the Drew had gone far out of the way, and waited a considerable time to enable those two tows to clear each other. It is plain that no such maneuver was contemplated between the Drew and the Camelia, and I do

not think the circumstances reasonably required it. Their signals were of one whistle, which meant that each was going to the right; *i. e.*, continuing on her course to the right. Nor would there have been any difficulty had the Camelia kept in mid-channel, in which, or very near which, she must have been when she exchanged signals with the Drew. The Camelia's pilot so testifies. The place of the collision close to the middle ground, and the fact that the Camelia passed the Drew not over 100 feet distant, show that the Camelia must have hauled to the eastward after her signal to the Drew; and although there are statements of the pilot difficult to reconcile on this point, I understand his testimony in several places to admit this fact; and there is no doubt that while the Drew was passing the tow he was hauling to the eastward in accordance with his signal of two whistles to the Norwich below. The situation was really brought about by the pilot of the Camelia in shaping his course to pass the steam canal-boat which was ahead of him, before getting out of that narrow channel-way, instead of gradually slackening his speed a little, as he safely might and should have done, without attempting to pass her at that spot. It was imprudent and blamable for three boats, two of them having tows, to attempt to go abreast at the entrance of that comparatively narrow channel. This attempt is not imputable to the Drew; nor could her pilot anticipate that, after a signal of one whistle, meaning that the Camelia would keep to the right, she would haul to the left, and diminish the space available to the Drew, so as finally to close up her passage, as was done. For this reason I think the blame must rest with the Camelia alone. The libelants are entitled to a decree against the Camelia, with costs; and the libel against the Drew must be dismissed, with costs.